**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA,

      Plaintiff,

                                      Case No.  3:16-cv-1248-J-34PDB

vs.

ESTATE OF STEVEN SCHOENFELD and
ROBERT SCHOENFELD, a distributee of
the Estate of Steven Schoenfeld,

      Defendants.

_____/

# O R D E R

**THIS CAUSE** is before the Court on Defendants' Second Motion to Dismiss Amended Complaint or in the Alternative for Summary Judgment and Incorporated Memorandum of Law (Doc. 46; Motion), filed on October 24, 2017.  Plaintiff, United States of America (the "Government"), filed the Response in Opposition to Defendants' Second Motion to Dismiss or in the Alternative for Summary Judgment and Incorporated Memorandum of Law (Doc. 51; Response) on December 11, 2017.  Accordingly, this matter is ripe for review.

## I.      Background[1]

This action arises out of the Government's efforts to collect a penalty assessed against Steven Schoenfeld pursuant to 31 U.S.C. § 5321 ("Section 5321") based on his failure to file a Foreign Bank Account Report ("FBAR").  See generally Amended Complaint (Doc. 6).  Thus, before summarizing the factual background of this case, the Court will provide an overview of the FBAR filing requirement.

### A. FBAR Filing Requirement

In 1970, Congress enacted the Currency and Foreign Transactions Reporting Act, commonly referred to as the Bank Secrecy Act ("BSA"), 31 U.S.C. §§ 5311-5314, 5316-5332, in order to combat money laundering in the United States.  See Internal Revenue Serv., Bank Secrecy Act, available at https://www.irs.gov/businesses/small-businesses-self-employed/bank-secrecy-act (last accessed May 6, 2018) ("BSA Guide"); Internal Revenue Manuals § 4.26.16 (2017), available at https://www.irs.gov/irm/part4/irm_04-026-016 (last accessed May 6, 2018) ("IRS Manual").  "The BSA requires businesses to keep records and file reports that are determined to have a high degree of usefulness in criminal, tax, and regulatory matters."  See BSA Guide at 2.  These reports "are heavily used by law enforcement agencies, both domestic and international[,] to identify, detect and deter money laundering whether it is in furtherance of a criminal enterprise, terrorism, tax evasion or other unlawful activity."  Id.  Congress authorized the Department of Treasury (the "Treasury") to implement the BSA.  See 31 U.S.C. § 5311.

---

[1]      The facts recited in this section are either undisputed, or any disagreement has been indicated. Because this case is before the Court on Defendants' Motion, the facts recited herein, and all reasonable inferences therefrom, have been viewed by the Court in a light most favorable to the Government.  See T-Mobile S. LLC v. City of Jacksonville, Fla., 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008).

Pursuant to the BSA, United States "persons"[2] are required to file an FBAR indicating their financial interests in and/or signatory authority over a foreign account if certain conditions are met. <u>See</u> 31 U.S.C. § 5314(a); 31 C.F.R. §§ 1010.350(a). Specifically, such persons must file an FBAR by June 30 "of each calendar year with respect to foreign financial accounts exceeding $10,000 maintained during the previous calendar year." <u>See</u> 31 C.F.R. § 1010.306(c).

Congress authorized the Secretary of the Treasury (the "Secretary") to assess penalties against those who fail to satisfy the FBAR filing requirement. <u>See</u> Section 5321; 31 U.S.C. § 5322. The Secretary delegated authority to the Internal Revenue Service ("IRS") to impose criminal penalties, and to the Director of the Financial Crimes Enforcement Network ("FinCEN"), a bureau of the Treasury, to impose civil penalties. <u>See</u> IRS Manual. In April 2003, FinCEN delegated its FBAR duties to the IRS. <u>See</u> IRS Reference Guide at 2. Thus, the IRS is responsible for "[i]nvestigating possible civil violations," "[a]ssessing and collecting civil penalties"; and "[i]ssuing administrative rulings." <u>Id.</u>

The IRS may impose civil penalties based on negligence, <u>see</u> Section 5321(a)(6)(A), a pattern of negligent activity, <u>see</u> Section 5321(a)(6)(B), a non-willful violation, <u>see</u> Section 5321(a)(5)(A), (B), and a willful violation, <u>see</u> Section 5321(a)(5)(C). For willful violations, the IRS may impose a criminal penalty and/or a civil penalty. <u>See</u> Section 5321; 31 U.S.C. § 5322. The civil penalty for a willful violation may not exceed the

---

[2]     A "person" for purposes of the FBAR filing requirement is: (1) "[a] citizen or resident of the United States"; (2) "[a]n entity created or organized in the United States or under the laws of the United States," including but not limited to "a corporation, partnership, and limited liability company"; (3) "[a] trust formed under the laws of the United States"; or (4) "[a]n estate formed under the laws of the United States." <u>See</u> Internal Revenue Serv., IRS FBAR Reference Guide, http://www.irs.gov/pub/irs-utl/IRS_FBAR_Reference_Guide.pdf (last accessed May 4, 2018) ("IRS Reference Guide") at 2.

greater of $100,000, or 50% of the amount in the unreported account.  <u>See</u> Section 5321(a)(5)(C).

The IRS must assess a civil penalty within six years of the violation.  <u>See</u> Section 5321(b)(1).  To collect the assessment, the Government must commence a civil action within two years of the later of "(A) the date the penalty was assessed; or (B) the date any judgment becomes final in any criminal action under section 5322 in connection with the same transaction with respect to which the penalty is assessed."  <u>See</u> Section 5321(b)(2).

### B. Factual Background

In 1993, Steven Schoenfeld, a citizen of the United States, established a foreign account with UBS AG in Switzerland with funds he acquired from the sale of a New York apartment.  <u>See</u> Amended Complaint ¶11; Deposition of Robert Andrew Schoenfeld (Doc. 52; Schoenfeld Dep.) at 9, 30; Schoenfeld Dep. Exhibits (Doc. 53) at 1.  The account "generated income from interest, dividends, and Passive Foreign Investment Company Gains."  <u>See</u> Amended Complaint ¶14.

The Government asserts that Steven Schoenfeld did not "report his income from, or financial interest in, his foreign account on his federal tax returns for any year of the account's existence," even though he "reported interest and investment income from domestic sources."  <u>See</u> Amended Complaint ¶¶15-16.

In 2009, "UBS AG notified account holders that it might provide their account information to the" IRS.  <u>Id.</u> ¶18; Schoenfeld Dep. Exhibits at 11.  In response, Steven Schoenfeld told his tax representative that he would not authorize UBS AG to release such information.  <u>See</u> Amended Complaint ¶19.  On August 4, 2010, the tax representative informed Robert Schoenfeld of his father's position.  <u>Id.</u>; Schoenfeld Dep. Exhibits at 25.

On July 14, 2010, UBS AG closed Steven Schoenfeld's account, id. ¶12; Schoenfeld Dep. at 53; Schoenfeld Dep. Exhibits at 3, and later "wired its funds to a U.S.-based brokerage firm, Raymond James Financial Services," to an account in the name of Steven Schoenfeld, with his son, Robert Schoenfeld, designated as "the sole beneficiary and trading agent." See Amended Complaint ¶13; Schoenfeld Dep. at 37, 54.  During this time period and thereafter, Robert Schoenfeld "assisted in his father's financial affairs."  See Amended Complaint ¶19; Schoenfeld Dep. at 22-24.

"On September 30, 2014, the [IRS] assessed a civil penalty against Steven Schoenfeld pursuant to Section 5321(a)(5) for willfully failing to file an FBAR for calendar year 2008." Id. ¶24.  Between January 1, 2008, and June 30, 2009, the balance of Steven Schoenfeld's account exceeded $10,000.  Id. ¶20.  Thus, the IRS assessed a penalty against Steven Schoenfeld in the amount of $614,300—50 percent of the account's $1,228,600 balance.  Id. ¶¶20, 25.  Although the IRS notified Steven Schoenfeld of the assessment and demanded payment, Steven Schoenfeld did not pay the amount demanded.  Id. ¶¶26-27.  As of August 16, 2016, the amount sought by the Government had grown to $690,188.69, consisting of the FBAR penalty and interest and penalties for late payment under 31 U.S.C. § 3717(e)(2).  Id. ¶28.

Unbeknownst to the Government, Steven Schoenfeld died on August 21, 2015.  See Motion, Ex A: Certificate of Death; see generally Declaration of Kari Powell (Powell Decl.) ¶4.  He died testate and appointed Robert Schoenfeld as the personal representative of his estate.  See Last Will & Testament of Steven William Schoenfeld (Doc. 28-3; Will) at p.3, Art. VI.  However, Robert Schoenfeld did not present the Will for probate.  See Schoenfeld Dep. at 29-30.

On September 29, 2016, the Government initiated this action against Steven Schoenfeld to reduce its assessed penalty to judgment.  See generally Complaint (Doc. 1). The Government sent the Complaint and a request for waiver of service to Steven Schoenfeld's address, where Robert Schoenfeld resides.  See Powell Decl. ¶¶3-4.  On October 27, 2016, an attorney representing the Schoenfeld family wrote a letter to the Government advising that Steven Schoenfeld had died.  See Letter from Defense Counsel (Doc. 51-2; Letter).  Accordingly, on December 14, 2016, the Government filed the Amended Complaint as of right pursuant to Rule 15(a).  See generally Amended Complaint.  In the Amended Complaint, the Government named the Estate of Steven Schoenfeld (the "Estate") as a defendant pursuant to 28 U.S.C. § 2404 ("Section 2404"), and Robert Schoenfeld as a defendant based on his status as distributee of the Estate. See generally id.  A process server submitted proofs of service attesting that he served the Amended Complaint on both Defendants personally at Robert Schoenfeld's home on December 15, 2016.  See Powell Decl. ¶6; Proof of Service (Doc. 8).

On January 5, 2017, Defendants moved to dismiss the Amended Complaint or, in the alternative, for summary judgment.  See Defendants' Motion to Dismiss Amended Complaint or in the Alternative for Summary Judgment and Incorporated Memorandum of Law (Doc. 9; First Motion).  After review of the briefing,[3] the Court set the First Motion for a hearing on September 22, 2017.  See Order (Doc. 33).  At the hearing, the court denied

---

[3]     The Government filed a response on January 18, 2017.  See Response in Opposition to Defendants' Motion to Dismiss Amended Complaint or in the Alternative for Summary Judgment and Incorporated Memorandum of Law (Doc. 11).  The Government supplemented its response on February 6, 2017, see Notice of Supplemental Authority (Doc. 16), and August 9, 2017, see United States' Supplemental Filing of Newly Discovered Evidence (Doc. 28).

the First Motion, without prejudice, and gave Defendants until November 9, 2017, to file a renewed motion to dismiss or for summary judgment.  See Clerk's Minutes (Doc. 40).

In response to the Court's directive, Defendants filed the Motion on October 24, 2017.  See generally Motion.  In the Motion, Defendants contend that the original Complaint was a legal nullity that could be not be cured by amendment or relation-back principles.  Id. at 7-14.  Additionally, Defendants assert that the Government may not rely on Section 2404 to pursue its claim, that the Estate lacks the capacity to be sued under Rule 17, and that the Government's claim abated upon Steven Schoenfeld's death.  Id. at 14-22.  In the Response, the Government maintains that it properly filed the Amended Complaint, which related back to the timely filed original Complaint.  See Response at 9-15.  Further, the Government states that it does not rely on Section 2404 to pursue its claim against Robert Schoenfeld, but contends that it properly relies on Section 2404 to proceed against the Estate.  Id. at 18-23.  Additionally, the Government disputes Defendants' contention that its claim abated upon Steven Schoenfeld's death.  Id. at 4-8.

## II.    Discussion

The Court will now address the merits of the parties' arguments.  First, the Court will consider whether the original Complaint was a legal nullity, or whether its deficiency could be cured through amendment, and if it could be cured by amendment, whether the Amended Complaint relates back to the date of the original filing such that the claim in the Amended Complaint is not barred by the statute of limitations.  Then, the Court will determine whether Section 2404 is an appropriate vehicle for the Government to pursue its claim, and whether the Government has a basis to proceed outside the context of

Section 2404.  Last, the Court will consider whether the Government's claim abated upon Steven Schoenfeld's death.

### A. Legal Nullity or Capable of Amendment

Under Florida law a decedent lacks the capacity to be sued.  See Xtra Super Food Center v. Carmona, 516 So. 2d 300, 301 (Fla. 1st DCA 1987).  Thus, there is no dispute that this action could not proceed against Steven Schoenfeld.  See Motion at 7-8; see generally Response.  In order to correct the error in the original Complaint, which named Steven Schoenfeld, the Government filed the Amended Complaint against the Estate and Robert Schoenfeld, as a distributee of the Estate.  See generally Docket.  It did so, however, only after the statute of limitations had expired.

In the Motion, Defendants contend that because a deceased individual does not have the capacity to be sued, the original Complaint - filed against the deceased Steven Schoenfeld - was a legal nullity that was "void ab initio."  See Motion at 5-6, 7-9.  In support of this contention, Defendants rely heavily on the decisions of the district court and the Eleventh Circuit Court of Appeals in the In re Engle Cases ("Engle I"), No. 3:09-cv-10000-J-32JBT, 2013 WL 8115442 (M.D. Fla. Jan. 22, 2013), aff'd, 767 F.3d 1082 (11th Cir. 2014), where the district court dismissed 521 personal injury actions filed on behalf of deceased plaintiffs.  See Motion at 7-9; see also Engle I, 2013 WL 8115442, at *2.  In Engle I, the district court held that "a lawsuit filed in the name of a deceased individual is a nullity over which th[e] [c]ourt has no jurisdiction."  Engle I, 2013 WL 8115442, at *2.  In doing so, the court "recognize[d] that under certain circumstances when the proper cause of action is alleged but the plaintiff lacks capacity, or where the plaintiff dies after the complaint has been filed, substitution and amendment may be proper under Rules 17, 25, or 15."  Id. at

*4.   However neither substitution nor amendment were available remedies in Engle I because the "personal injury" claims asserted by the "dead plaintiffs" were "not viable in the first place." Id. at *4.  In other words, not only did the named plaintiffs, who were dead at the time of filing, not have the capacity to sue, the claims brought by the dead plaintiffs seeking damages for personal injury rather than damages for wrongful death were "never viable." In re Engle Cases ("Engle II"), 767 F.3d 1082, 1104 (11th Cir. 2014).  The district court went on to conclude that even if the original complaints were not legal nullities, neither substitution under Rule 17 nor amendment were appropriate based upon the procedural history of the case.  See Engle I, 2013 WL 8115442, at **4-5.    While Defendants assert that the Eleventh Circuit affirmed Engle I "in toto," that is not entirely accurate.  See Motion at 7 n.6.  Although the court did affirm the dismissal of the 521 actions, it expressly declined to address the district court's conclusion that each of the initial lawsuits was a legal nullity. Engle II, 767 F.3d at 1108 & 1108 n.30.  Thus, to the extent Defendants argue that the original Complaint here was a legal nullity, their reliance on the Engle cases is properly limited to Engle I.

The Court finds Engle I readily distinguishable from the instant action.  In Engle I, the court determined that a legal action commenced in the name of a party that has no capacity to sue "is a legal nullity over which this Court has no jurisdiction." See Engle I, 2013 WL 8115442, at *2.  It did not consider the question before this Court—that is whether a legal action commenced by a proper party but naming a dead person is a legal nullity. The majority of federal courts that have considered that narrow question appear to agree that such an action is not a legal nullity and can be cured by amendment.  For example, in Loudenslager v. Teeple, 466 F.2d 249 (3d Cir. 1972), the plaintiff filed suit against an

individual who had been dead for over a year. Id. at 249.  After the statute of limitations expired, the plaintiff moved to amend to name the personal representative of the estate as the defendant. Id. at 249.  The district court denied the request finding that under state law, the action was a nullity, and thus could not be amended. Id. at 249-50.  The Third Circuit Court of Appeals reversed the district court. Id. at 250-51.  In doing so the court explained that the question of whether an amendment was permissible was governed not by state law but by Rule 15 of the Federal Rules of Civil Procedure. Id. at 250.  Applying the version of Rule 15(c) in effect at that time, the court held that amendment was permissible because the personal representative received notice of the suit before the statute of limitations expired and knew or should have known that but for a mistake the action would have been brought against him. Id.[4]  Thus, because the relation-back requirements of the Federal Rules were satisfied, the action was not a nullity and the court determined that the amendment should have been permitted. Id. at 251.  Similarly, in Estate of A.A. v. United States, No. 3:15-cv-1479 (JCH), 2016 WL 7471634 (D. Conn. Dec. 28, 2016), the court applied federal law to determine whether a complaint was capable of amendment. Id. at *10.  Ultimately, despite the fact that the named defendant died before the pleading was filed, the court granted leave to amend to name the estate representative. Id. at *12.  The court in Pilgrim v. Doe, No. 9:11-cv-1331 (GLS/DEP), 2014 WL 4828091 (N.D.N.Y. Sept. 29, 2014) also determined that a complaint filed against a deceased party could be amended under Rule 15(a) to name the deceased defendant's estate. Id. at *3.

---

[4]     In 1991, Rule 15(c) was amended to require federal courts to "apply state law relation-back rules to amendments in a diversity case where state law provides the applicable statute of limitations." Saxton v. ACF Indus., Inc., 254 F.3d 959, 963 (11th Cir. 2001).  The 1991 amendment also expanded the period in which the named defendant could have received notice to include the time allowed for such under Rule 4m. See Rule 15 advisory committee's note 1991 amends.

And last, in <u>Darmanchev v. Roytshteyn</u>, 234 F.R.D. 78 (E.D. Pa. 2005), a Pennsylvania district court rejected the contention that an action filed against a predeceased defendant was incapable of amendment.  <u>Id.</u> at 80.  Although under Pennsylvania law the complaint filed against a dead person would have been a legal nullity, the court applied Rule 15 to determine that the complaint was capable of amendment.  <u>Id.</u>[5]  Thus, it appears that as a matter of federal procedure, a complaint filed against a deceased defendant is capable of amendment under appropriate circumstances.

Defendants fail to present legal authority sufficient to convince the Court that the original Complaint was a legal nullity incapable of amendment.  Defendants' case law is distinguishable from this action, and therefore not of assistance in resolving the Motion.[6]  In reaching this conclusion the Court recognizes that in <u>Guettler v. City of Montgomery</u>, No. 2:11-cv-573-WHA, 2012 WL 1987188 (M.D. Ala. June 4, 2012), the court dismissed a claim against a predeceased defendant citing to Alabama law for the proposition that an action filed against a deceased individual is a legal nullity.  <u>Id.</u> at *1 n.1 (citing <u>A.E. v. M.C.</u>, 100 So.3d 587, 595 (Ala. Civ. App. 2012)).  <u>Guettler</u> is unpersuasive for at least two reasons.  First, unlike here, after being notified that the defendant had died prior to the initiation of the suit, plaintiff made no effort to amend the complaint.  <u>Id.</u>  Indeed, the court dismissed the defendant based on the plaintiff's failure to respond to a summary judgment motion

---

[5]     Because state law provided the applicable statute of limitations, it appears that state law relation-back principles would have applied.  Nevertheless, this Court looks to <u>Darmanchev</u> for its application of federal relation-back principles.

[6]     Defendants' other authorities are equally inapt, as they are procedurally distinct from this case.  <u>See</u> Motion at 9 n.8 (citing <u>Bank of Nova Scotia v. Bass</u>, No. 2006-117, 2017 WL 874702, at *3 (D. V.I. Mar. 3, 2017) (vacating a default judgment obtained against a decedent); <u>In re Aredia & Zometa Prods. Liability Litig.</u>, No. 3-06-MD-1760, 2012 WL 2015791, at **1-2 (M.D. Tenn. June 5, 2012) (dismissing an action brought by a decedent based on standing).

asserting that the defendant was dead prior to suit and had never been served.  Id.  Thus, the Guettler court had no occasion to consider whether the complaint was capable of amendment.  Second, to the extent the Guettler court's citation to A.E. could be construed as addressing the possibility of amendment, this Court would find it inapposite as it failed to consider Rule 15 or applicable federal authority.

Engle I is also distinguishable because the Engle I plaintiffs not only lacked the capacity to sue, they filed claims that were "not viable" from the start.  The personal injury claims filed on behalf of the dead plaintiffs simply did not exist at the time the suits were filed. See Banakus v. United Aircraft Corp., 290 F. Supp. 259, 260 (S.D.N.Y. 1968) ("Since [plaintiff] was dead when the action for personal injuries was commenced, that action must be treated as a nullity and it cannot be given life by substituting parties and amending the complaint.").  For that reason the Engle I court found the plaintiffs' reliance on the Tenth Circuit decision in Esposito v. United States, 368 F.3d 1271 (10th Cir. 2004) to be unavailing.  See Engle I, 2013 WL 8115442, at *3.  In Esposito, the court allowed substitution of the widow of a plaintiff for the plaintiff in a wrongful death suit mistakenly filed in the name of the deceased.  See Esposito, 368 F.3d at 1275-77.[7]  Here, unlike the personal injury claims at issue in Engle I, the Government filed the appropriate claim from the start, and as will be discussed, that claim did not abate upon Steven Schoenfeld's death.

---

[7]      Notably, in Esposito, the Tenth Circuit rejected the argument that substitution or relation back were unavailable because the case, filed by a dead person, was a nullity and applying the Federal Rules permitted substitution of the proper party even though the case was filed by a party without capacity to sue.  See Esposito, 368 F.3d at 1277-78.

Moreover, whereas the Engle I court had the discretionary authority to deny the plaintiffs' motions to amend their pleadings, the Government filed the Amended Complaint in this action as of right and did not need to seek leave of Court.  See Williams v. Bd. of Regents of Univ. Sys. of Ga., 477 F.3d 1282, 1292 n.6 (11th Cir. 2007) ("When the plaintiff has the right to file an amended complaint as a matter of course, however, the plain language of Rule 15(a) shows that the court lacks the discretion to reject the amended complaint based on its alleged futility.").[8]  Thus, Engle I fails to persuade the Court that the Government's filing of the Amended Complaint was improper in this case.

The Court finds Defendants' reliance on Mizukami v. Buras, 419 F.2d 1319 (5th Cir. 1969)[9] equally unpersuasive because it relates to a motion to substitute a deceased's heirs under Rule 25.  Id. at 1320.  Here, the Government did not substitute the Estate for Steven Schoenfeld under Rule 25, but amended its pleading as of right under Rule 15.  See Response at 9-10.  Although Rule 25 "contemplates substitution . . . for someone who had been made a party to the action before his death," Rule 15 is not subject to the same constraints as Rule 25.  See Conway v. Newburger, Loeb & Co., No. 71 Civ. 1508, 1974 WL 463, at *2 (S.D.N.Y. Nov. 25, 1974); Burns v. Phillips, 50 F.R.D. 187, 188 (N.D. Ga. 1970); Chorney v. Callahan, 135 F. Supp. 35, 36 (D. Mass. 1955); Wright, Miller & Kane,

---

[8]     Nevertheless, even if the Government had sought leave to amend under Rule 15, the Engle I court's concerns regarding counsel's dilatory tactics are not present here.  Defense counsel informed the Government of Steven Schoenfeld's death on October 27, 2016, see Letter, and the Government filed the Amended Complaint on December 14, 2016.

[9]     In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

7C Federal Practice & Procedure § 1951 (3d ed.).  Thus, cases analyzing Rule 25 are not helpful to the resolution of the Motion.

The weight of authority supports the conclusion that a complaint filed against a deceased individual is capable of amendment to cure that defendant's lack of capacity.  As such, the Court declines to find the original Complaint in this action to be a legal nullity that was void <u>ab initio</u>.  Nevertheless, because the statute of limitations on the Government's claim expired before the Government filed the Amended Complaint, this action is subject to dismissal unless the filing of the Amended Complaint relates back to the date of the filing of the original Complaint.

Rule 15(c) governs the determination of whether the Amended Complaint relates back to the filing of the original Complaint.  <u>See</u> <u>Krupski v. Costa Crociere S. p. A.</u>, 560 U.S. 538, 541 (2010).  Rule 15(c)(1) provides:

> An Amendment to a pleading relates back to the date of the original pleading when:
>
> (A) The law that provides the applicable statute of limitations allows relation back;
>
> (B) The amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading; or
>
> (C) The amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied, and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>
> > i.   Received such notice of the action that it will not be prejudiced in defending on the merits; and
> >
> > ii.  Knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity

14

Here, the parties do not dispute that federal law supplies the statute of limitations for the Government's claim, and thus, it is federal relation-back rules that govern the Court's analysis.  See Rule 15(c)(1); Saxton v. ACF Industries, Inc., 254 F.3d 959, 963 (11th Cir. 2001).   Turning to the requirements of Rule 15(c), the parties dispute whether the Government made a mistake concerning the proper party's identity and whether Defendants knew, or should have known, that the action would have been brought against them but for a mistake.  See Motion at 11-13; Response at 12-14.  Notably, where the mistake requirement of Rule 15(c) is not satisfied, "there can be no relation back regardless of whether other requirements, such as notice and lack of prejudice to the joined party, are met."  Wayne v. Jarvis, 197 F.3d 1098, 1103 n.5 (11th Cir. 1999); overruled on other grounds by Manders v. Lee, 338 F.3d 1304, 1328, n.52 (11th Cir. 2003).

In order to determine whether the mistake requirement of Rule 15(c) is satisfied, the Court must perform a two part inquiry.  See Krupski, 560 U.S. at 548-49.  The Court must determine whether the plaintiff was actually mistaken as to the proper party's identity.  Id. And, the Court must consider whether the proper party knew or should have known that it would have been sued if not for that mistake.  Id.

With respect to the first inquiry, the Court finds that the Government made a mistake concerning the identity of the proper defendant.  A mistake is defined as "[a]n error, misconception, or misunderstanding; an erroneous belief."  Id. at 548 (quoting Black's Law Dictionary (9th ed. 2009)).  In applying Rule 15(c), the Eleventh Circuit has instructed that the term "mistake" is to be construed liberally.  Itel Capital Corp. v. Cups Coal Co., 707 F.2d 1253, 1258 n.9 (11th Cir. 1983).  Nevertheless, "even the most liberal interpretation of 'mistake' cannot include a deliberate decision not to sue a party whose identity plaintiff

knew from the outset.'"   <u>Powers v. Graff</u>, 148 F.3d 1223, 1227 (11th Cir. 1998) (citation omitted); <u>Krupski</u>, 560 U.S. at 549.   However:

> [A] plaintiff might know that the prospective defendant exists but nonetheless harbor a misunderstanding about his status or role in the events giving rise to the claim at issue, and she may mistakenly choose to sue a different defendant based on that misimpression.   That kind of deliberate but mistaken choice does not foreclose a finding that Rule 15(c)(1)(C)(ii) has been satisfied.

<u>Krupski</u>, 560 U.S. at 549.

Defendants contend that relation-back is inappropriate because the Government made a deliberate choice to sue Steven Schoenfeld with full knowledge of Robert Schoenfeld's identity.   <u>See</u> Motion at 11-13.   However, the Government asserts that it was unaware of Steven Schoenfeld's passing, and therefore misunderstood the parties' legal status when it filed the original Complaint.   <u>See</u> Response at 12-15.

Here, the Court finds that even though the Government knew of Robert Schoenfeld's existence, its belief that Steven Schoenfeld was alive constitutes a mistake for purposes of Rule 15(c).   Although the Government made a deliberate choice to sue Steven Schoenfeld, its mistaken belief that he was alive bears directly on the parties' legal status and capacity to be sued, which goes to the heart of a Rule 15(c) mistake.   <u>Compare Krupski</u>, 560 U.S. at 549; <u>Brown v. VCNA Prestige Concrete Prods., Inc.</u>, No. 6:13-cv-979-Orl-31TBS, 2014 WL 1293266, at *3 (M.D. Fla. Mar. 31, 2014) (finding Rule 15(c) satisfied where the plaintiffs "were aware of multiple corporate entities, and when faced with multiple choices, it appears they selected . . . the wrong one.") <u>with</u> <u>Nelson v. Adams USA, Inc.</u>, 529 U.S. 460 (2000) (finding no mistake where the defendant knew of the defendant's "role and existence."); <u>Powers</u>, 148 F.3d at 1227 (finding no mistake where "Plaintiffs not only knew Defendants' identity, but also knew of a claim against Defendants," and "elected not

to sue these individuals."); <u>Loudenslager</u>, 466 F.2d at 250-51 (permitting amendment due to a mistake regarding the dead defendant's status); <u>Estate of A.A.</u>, 2016 WL 7471634, at **11-12 (same); <u>Darmanchev</u>, 234 F.R.D. at 81 (same).  Indeed, the Supreme Court has noted that the amendments to Rule 15 contemplated a situation where a plaintiff files suit against a non-legal entity based on a misunderstanding about that entity's legal status. <u>See</u> <u>Krupski</u>, 560 U.S. at 550 (citing <mark>Rule 15(c)(3) advisory committee's note 1966 amends.</mark>).  In doing so, the Court explained that Rule 15's relation-back provision was added to provide a way for individuals who had been denied social security benefits but mistakenly filed actions against non-existent defendants to cure their pleadings.  <u>Id.</u> at 550-51.  Here, the Government, much like the social security plaintiffs as well as the plaintiffs in <u>Loudenslager</u>, <u>Darmanchev</u>, and <u>Estate of A.A.</u>, filed suit against a defendant without capacity based on a misunderstanding regarding the legal status of the defendant.  Rule 15(c) operates to address precisely this type of mistake.

In the Motion, Defendants also contend that the Government's failure to learn that Steven Schoenfeld died prior to filing the Complaint constitutes a breach of its duty to perform a reasonable inquiry prior to making a representation to the Court under Rule 11. <u>See</u> Motion at 6-7.  However, whether a mistaken belief set forth in a pleading warrants the imposition of sanctions under Rule 11 has no bearing on whether that mistaken belief constitutes a "mistake" for purposes of a Rule 15(c) relation-back analysis.  Moreover, as noted in <u>Krupski</u>, "Rule 15(c)(1)(C)(ii) asks what the prospective <u>defendant</u> knew or should have known . . ., not what the <u>plaintiff</u> knew or should have known at the time of filing of [the] original complaint." <u>Krupski</u>, 560 U.S. at 548.  Thus, the Government's mistaken belief as to Steven Schoenfeld's legal status is sufficient for purposes of Rule 15(c), regardless

of whether, with a more diligent inquiry, it could or should have known of Steven Schoenfeld's death.

Next, the Court must consider what the prospective <u>defendant</u> in this case "knew or should have known during the Rule 4(m) period." <u>Id.</u> Notably, Defendants do not dispute that they knew, or should have known, that but for the Government's belief that Steven Schoenfeld was alive, they would have been named as defendants. <u>See generally</u> Motion. Here, "the face of the complaint plainly indicated" that the Government believed that Steven Schoenfeld was alive by referring to Steven Schoenfeld in the present tense. <u>See</u> <u>Krupski</u>, 560 U.S. at 555; Complaint ¶7 ("Schoenfeld is a citizen of the United States"), ¶25 ("Schoenfeld is liable to the United States . . ."). Thus, the Government's mistake as to Steven Schoenfeld's status "was obvious and apparent." <u>Loudenslager</u>, 466 F.2d at 250. Further, despite Defendants' contention that the Government made a deliberate choice to sue Steven Schoenfeld, <u>see</u> Motion at 11-13, Defendants have "articulated no strategy that [they] could reasonably have thought [the Government] was pursuing in suing a defendant that was legally unable to provide relief." <u>See</u> <u>Krupski</u>, 560 U.S. at 555. That Defendants immediately protected their interests by hiring an attorney to represent them and speak on behalf of the family further reflects that Robert Schoenfeld knew that both he and the Estate faced potential liability. <u>See</u> Letter; <u>Brennan v. Smith's Estate</u>, 301 F. Supp. 307, 309 (M.D. Pa. 1969) ("It is apparent that Genevieve Smith took steps to protect the interests of the estate since an answer was filed on behalf of both defendants."). Additionally, Defendants received the Government's waiver of service and a copy of the original Complaint by October 27, 2016, well within the period for completion of service of process under Rule

4(m), which undercuts any argument that they would be "'prejudiced in defending on the merits.'"  See Estate of A.A., 2016 WL 7471634, at *11 (quoting Rule 15(c); Letter.

Here, the Court finds that the original Complaint was not a legal nullity which rendered this action void ab initio, and therefore, it could be cured by amendment.  Further, the Court concludes that the Amended Complaint relates back to the date of the filing of the original Complaint because the claims relate to those set forth in the original Complaint, Defendants received notice of the action within the Rule 4(m) period, the Government was mistaken as to the parties' legal statuses, and Defendants knew, or at the very least, should have known, that but for this mistake, they would have been named as defendants. Accordingly, the Amended Complaint is not barred by the statute of limitations.[10]

### B. Section 2404

Next, the Court will address Defendants' contention that the Government may not pursue its claim under Section 2404.  See Motion at 14-19.   In the Response, the Government states that its claim against Robert Schoenfeld is based on his status as a distributee of the Estate, independent of Section 2404.  See Response at 22-23. Additionally, the Government disputes Defendants' contention that it may not proceed against the Estate under Section 2404, but contends that even if Section 2404 were inapplicable, it may proceed against the Estate based on equitable principles.   See Response at 15-21.  Having considered the parties' arguments, the Court finds that the Amended Complaint is due to be dismissed as to the Estate because it lacks the capacity

---

[10]    As such, the Court need not address the Government's contention that it is entitled to equitable tolling.  See Response at 15 n.12.

to be sued under Rule 17.  However, the Government may pursue its claim against Robert Schoenfeld.

An estate's capacity to be sued is determined "by the law of the state where the court is located."  See Rule 17(b)(3); see also Glickstein v. Sun Bank/Miami, N.A., 922 F.2d 666, 671 (11th Cir. 1991), abrogated on other grounds, Saxton, 254 F.3d at 963.  Under Florida law, "it is well-settled that 'an 'Estate' is not an entity that can be a party to litigation. It is the personal representative of the estate, in a representative capacity, that is the proper party.'"  Spradley v. Spradley, 213 So.3d 1042, 1045 (Fla. 2d DCA 2017) (citation omitted); see also Fla. Stat. § 733.612(20).  Despite this, the Government contends that Section 2404 provides a vehicle through which it can sue the Estate.  See Response at 18-20. Specifically, Section 2404 provides:

> [a] civil action for damages commenced by or on behalf of the United States or in which it is interested shall not abate on the death of a defendant but shall survive and be enforceable against his estate as well as against surviving defendants.

(emphasis added).  The interpretation of the term "estate" as used in this federal statute "is a question of federal law."  Caley v. Gulfstream Aerospace Corp., 428 F.3d 1359, 1369 n.9 (11th Cir. 2005).  Although no court within the Eleventh Circuit has interpreted the term, in United States v. Estate of Baxter, 568 F. Supp. 707, 711 (D. Kan. 1983), the District of Kansas opined that the term estate as used in Section 2404 encompassed "all of the property in which the decedent had an interest at the moment of his death" which would include any property "transferred to others either by will or by operation of the laws of intestate succession."  Id. at 711-12.  The court held that it would be "overly narrow and technical" to define estate under Section 2404 as a legal entity created by a state probate court.  Id. at 710-11.  Other courts have repeated the definition adopted by the District of

Kansas.  See United States ex rel. Madany v. Petre, No. 09-13693, 2015 WL 6667770, at *3 (E.D. Mich. Nov. 2, 2015) (finding the widow of a deceased defendant to be the proper party to receive service for the estate where the evidence established that she was a distributee of the estate); Sequoia Prop. & Equip. Ltd. P'ship v. United States, No. CV-F-97-5044-LJO, 2002 WL 32388132, at *2 (E.D. Cal. June 3, 2002) (noting that an executor, administrator or distributee of a distributed estate would be a proper party for substitution of a deceased party and extending the time for substitution pending appointment of a personal representative or distribution of the estate).

Here, regardless of whether the Estate qualifies as a proper defendant under Section 2404, the Government may not pursue its claim under the statute.  This is so because by its terms, Section 2404, much like Rule 25, contemplates the continuation of an action brought against a defendant who died after the suit's commencement.  See generally Section 2404; see also Lee v. Venice Work Vessels, Inc., 512 F.2d 85, 86 (5th Cir. 1975) (noting that Section 2404 did not provide any real guidance because it contemplates the death of a defendant against whom an action is already pending). Despite the Government's contention that Section 2404 is designed to promote the public good, and therefore should be afforded a liberal interpretation, the Court may not change the plain meaning of the statutory language.  See Villarreal v. R.J. Reynolds Tobacco Co., 839 F.3d 958, 969-70 (11th Cir. 2016), cert. denied, 137 S. Ct. 2292 (2017) (noting that a court must not elevate notions of purpose over the plain meanings of a legislative enactment, nor may it rewrite a statute to effect a more desirable purpose).

Further, the Court is not persuaded otherwise by the Government's reliance on Section 2404's legislative history.  <u>See</u> Response at 19-20.  As originally enacted, the statute provided:

> [t]hat "no civil action to recover damages, brought by the United States or in its behalf, or in which the United States shall be directly or indirectly interested, and <u>pending against any defendant prior to the time of his death</u>, in any court of the United Sates, shall abate by reason of the death of any defendant; but any such action shall survive and be enforceable against the estate of any such deceased defendant.

Pub. L. No. 80, 48 Stat. 311 (1933) (emphasis added).  Although the phraseology of the statute has changed, the meaning is the same.  Section 2404 does not authorize the commencement of an action against an estate after the decedent has passed; it addresses the effect of a party's death after an action had been commenced.[11]  Accordingly, the Court is of the view that the Government may not pursue its claim against the Estate under Section 2404.

Additionally, the Court is not persuaded that the Government can proceed based on equitable principles.  Although courts have broad "discretion in refusing to aid the unclean litigant," the Government fails to provide any authority suggesting that this maxim may be used to allow a claim to proceed in the absence of a legal basis and against a defendant which lacks the legal capacity to be sued.  Thus, despite the Court's interest in "prevent[ing] a wrongdoer from enjoying the fruits of his transgression [and] avert[ing] an injury to the public," <u>Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.</u>, 324 U.S. 806, 815 (1945), the fact remains that Section 2404 does not authorize commencement of this action against

---

[11]    The Court does not find the Government's reliance on <u>Sullivan v. Hudson</u>, 490 U.S. 877 (1989) persuasive.  <u>See</u> Response at 19.  In <u>Sullivan</u>, the Court determined that the term "civil action," as used within the Equal Justice Act, included social security proceedings.  <u>Sullivan</u>, 490 U.S. at 891.  This case is irrelevant, as the parties do not dispute whether the Government commenced a civil action under Section 2404, but on whether the Government may use Section 2404 to initiate an action against the estate.

the Estate and the Estate is not a proper party to this suit.  Accordingly, to the extent that the Estate seeks dismissal from this action, the Motion is due to be granted.

However, the Government may pursue its claim against Robert Schoenfeld.[12]  The Government alleges in the Amended Complaint that Robert Schoenfeld is a distributee of Steven Schoenfeld's estate.  See Amended Complaint ¶8.  Further, it contends that "[a]s the personal representative named in Steven's will and the sole beneficiary of his Estate, Robert is a proper party to this suit."  See Response at 22.  The issue of whether a distributee is a proper party to a lawsuit has come up most frequently in the context of determining who is a proper party for substitution under Rule 25.  Rule 25 provides that "[i]f a party dies and the claim is not extinguished, the court may order substitution of the proper party.  A motion for substitution may be made by any party or by the decedent's successor or representative."  Thus, although the Government did not substitute Robert Schoenfeld under Rule 25, case law regarding the substitution of distributees is instructive as to a distributee's capacity to be sued under Rule 17.  Notably, "[w]ith respect to the Federal Rules in particular, the Supreme Court has instructed that, except where doing so would 'produce absurd results,' 'words and phrases . . . must be given a consistent usage and be read in pari materia[;] . . . to do otherwise would attribute a schizophrenic intent to the drafters."  Yousuf v. Samantar, 451 F.3d 248, 256 (D.C. Cir. 2006) (quoting Marek v. Chesny, 473 U.S. 1, 21 (1985) (emphasis in Yousuf)).

---

[12]      By necessity, the Court will address matters outside of the four corners of the Amended Complaint in order to resolve the parties' dispute regarding Robert Schoenfeld's capacity to be sued under Rule 17. Therefore, the Court will treat the Motion as one for summary judgment under Rule 56.  See Luxor Agentes Autonomos De Investimientos, LTDA. v. Oliveira, No. 13-CV-20806-WILLIAMS, 2014 WL 11878426, at *3 (S.D. Fla. Nov. 3, 2014) (treating a motion to dismiss under Rule 17(b) as a motion for summary because it was supported by materials outside the pleadings); 5A Charles Alan Wright & Arthur Miller, Federal Practice & Procedure § 1294 (3d ed., Sept. 2018 update).

This Court, applying Rule 25, has recognized that "substitution may be by an appointed executor or administrator of the deceased party's estate, or by a distributee of a decedent's estate, as a 'successor.'" Valle v. Singer, No. 3:11-cv-700-J-34TEM, 2011 WL 13186681, at *8 (M.D. Fla. Dec. 7, 2011) (citations omitted) (emphasis added).  Courts in other jurisdictions have reached the same conclusion.  See In re Baycol Prods. Litig., 616 F.3d 778, 784-85 (8th Cir. 2010) (internal citations omitted); Sinito v. U.S. Dep't of Justice, 176 F.3d 512, 516 (D.C. Cir. 1999); McSurely v. McClellan, 753 F.2d 88, 99 (D.C. Cir. 1985); Rende v. Kay, 415 F.2d 983, 985 (D.C. Cir. 1969); Petre, 2015 WL 6667770, at *2; Sequoia Prop., 2002 WL 32388132, at *3 (applying Section 2404 and extending the time for substitution until the appointment of a personal representative or distribution of the estate to identify the proper party for substitution); Hardy v. Kaszycki & Sons Contractors, Inc., 842 F. Supp. 713, 716 (S.D.N.Y. 1993); Gronowicz v. Leonard, 109 F.R.D. 624, 626 (S.D.N.Y. 1986); Ashley v. Ill. Cent. Gulf Railroad Co., 98 F.R.D. 722, 724 (S.D. Miss. 1983).  Here, there is no genuine dispute that Robert Schoenfeld is the sole distributee of the Estate, as Robert Schoenfeld testified that he received 100% of his father's assets. See Schoenfeld Dep. at 27-29.  Thus, the Court finds that as a distributee of the estate, Robert Schoenfeld has the capacity to be sued under Rule 17.  Accordingly, as to Robert Schoenfeld, the Motion is due to be denied, as the Government may pursue its claim against him.

### C. Abatement v. Survival

As a final matter, the Court must determine whether the Government's claim abated upon Steven Schoenfeld's death.  An action brought against a deceased party cannot continue "unless the cause of action, on account of which the suit was brought, is one that

survives by law." Ex parte Schreiber, 110 U.S. 76, 80 (1884). "In the absence of an expression of contrary intent, the survival of a federal cause of action is a question of federal common law." United States v. NEC Corp., 11 F.3d 136, 137 (11th Cir. 1993), as amended, (Jan. 12, 1994) (citation omitted). Here, Congress has not specifically expressed its intention as to whether the Government's claim survives. Thus, the Court must turn to federal common law for guidance.

"It is well-settled that remedial actions survive the death of [a party], while penal actions do not." Id. A remedial action "compensates an individual for specific harm suffered," whereas a penal action "imposes damages upon the defendant for a general wrong to the public." Id. In the parties' briefs, they rely on the framework set forth in Hudson v. United States, 522 U.S. 93 (1997) to determine whether the FBAR penalty is remedial or penal in nature. See Motion at 19-22; Response at 4-8. The Hudson framework entails (1) asking whether the legislature expressed a preference for labeling the penalizing mechanism as civil or penal, and (2) applying the seven "Kennedy factors"[13] to determine "'whether the scheme was so punitive either in purpose or effect' as to 'transfor[m] what was clearly intended as a civil remedy into a criminal penalty.'" Hudson, 522 U.S. at 99-100 (citation omitted). The Kennedy factors include:

> (1) "[w]hether the sanction involves an affirmative disability or restraint"; (2) "whether it has historically been regarded as a punishment"; (3) "whether it comes into play only on a finding of scienter"; (4) "whether its operation will promote the traditional aims of punishment—retribution and deterrence"; (5) "whether the behavior to which it applies is already a crime"; (6) "whether an alternative purpose to which it may rationally be connected is assignable for it"; and (7) "whether it appears excessive in relation to the alternative purpose assigned."

---

[13]     The Supreme Court set forth the Kennedy factors in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69 (1963).

Id. (quoting from Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69 (1963)).  "[N]o one factor should be considered controlling as they 'may often point in differing directions.'" See Hudson, 522 U.S. at 101 (quotation omitted).  Notably, "where Congress has indicated an intention to establish a civil penalty, . . . 'only the clearest proof could suffice'" to establish that the penalty is penal in nature.   United States v. Ward, 448 U.S. 242, 248-49 (1980) (citation omitted).  Here, an analysis under the Hudson framework demonstrates that the FBAR penalty is remedial in nature, and therefore survived Steven Schoenfeld's death.

With respect to the first step of the analysis, the Court notes that Congress expressly indicates its preference that Section 5321 be regarded as civil by titling the statutory section authorizing the imposition of the sanction as "Civil Penalties."  See generally Section 5321; see also Ward, 448 U.S. at 249 ("[W]e believe it quite clear that Congress intended to impose a civil penalty upon persons in Ward's position" based on Congress's label).  This intent is further demonstrated by Congress's decision to confer enforcement authority on the Secretary.  "That such authority was conferred upon administrative agencies is prima facie evidence that Congress intended to provide for a civil sanction."  Hudson, 522 U.S. at 103; see also Helvering v. Mitchell, 303 U.S. 391, 402 (1938) (recognizing that "[c]ivil procedure is incompatible with the accepted rules and constitutional guaranties governing the trial of criminal prosecutions" because "the determination of the facts upon which liability is based may be made by an administrative agency instead of a jury."); Cole v. U.S. Dep't of Agric., A.S.C.S., 133 F.3d 803, 806 (11th Cir. 1998).

Next, an application of the Kennedy factors demonstrates that "there is little evidence, much less the clearest proof," see Hudson, 522 U.S. at 104, to transform the FBAR penalty, which "was clearly intended as a civil remedy," into a punishment, see

Ward, 448 U.S. at 249.  With respect to the first factor, the Court finds that a monetary fine, including a tax assessment, does not involve an affirmative disability or restraint.  See Simpson v. Bouker, 249 F.3d 1204, 1213 (10th Cir. 2001) (recognizing that monetary penalties do not constitute affirmative disabilities or restraints); Reiserer v. United States, 479 F.3d 1160, 1163 (9th Cir. 2007) (same); Cole, 133 F.3d at 806 (same).  An affirmative disability or restraint is normally understood as "'the infamous punishment' of imprisonment," which is inapplicable here.  Hudson, 522 U.S. at 104 (citation omitted).

Second, "the Supreme Court has determined that money penalties have not historically been viewed as punishment."  Cole, 133 F.3d at 806 (citing Hudson, 522 U.S. at 104).  Indeed, "the payment of fixed or variable sums of money [is a] sanction which ha[s] been recognized as enforce[a]ble by civil proceedings since the original revenue law of 1789."  Hudson, 522 U.S. at  104 (quoting Helvering, 303 U.S. at 400).  This applies equally to monetary tax penalties.  See Helvering, 303 U.S. at 401 ("The remedial character of sanctions imposing additions to a tax has been made clear by this Court in passing upon similar legislation."); see also Reiserer, 479 F.3d at 1163-64; Scadron's Estate v. Comm'r of Internal Revenue, 212 F.2d 188, 188 (2d Cir. 1954);  Kirk v. Comm'r of Internal Rev., 179 F.2d 619, 620-21 (1st Cir. 1950); Reimer's Estate v. Comm'r of Internal Revenue, 12 T.C. 913, 917-18 (1949).

Turning to the third factor, the Court notes that the BSA authorizes the Secretary to assess a penalty against all individuals who violate Section 5321, regardless of scienter.  See Section 5321(5)(A) ("The Secretary of the Treasury may impose a civil money penalty on any person who violates, or causes any violation of, any provision of section 5314.").  Although scienter affects the amount of the assessment, the FBAR  penalty may be

assessed regardless of intent.  "The fact that . . . 'good [or bad] faith' was considered in determining the amount of the penalty to be imposed in this case is irrelevant, as [the Court] look[s] only to 'the statute on its face' to determine whether a penalty is" penal.  Hudson, 522 U.S. at 104 (citation omitted); Cole, 133 F.3d at 806 (characterizing a penalty that was "imposed whenever a producer overs[old] his quota, regardless of his state of mind" as civil).

Next, with respect to the fourth factor, the Court finds that Section 5321 promotes retribution and deterrence, the traditional aims of punishment.  However, as noted by the Supreme Court and the Eleventh Circuit, "all civil penalties have some deterrent effect," and none are "'solely' remedial (i.e., entirely nondeterrent)."  Hudson, 522 U.S. at 102 (citations omitted); see also Cole, 133 F.3d at 807 ("[T]he over-quota marketing penalty is intended to deter producers from exceeding their quotas, but the legislative purpose of discouraging the sale of over-quota tobacco is merely a regulatory goal, not a criminal goal.").  This is insufficient to render the civil penalty a penal or criminal sanction as deterrence "may serve civil as well as criminal goals."  Id. (quoting United States v. Ursery, 518 U.S. 267, 292 (1996)).  As a result the Supreme Court has stated, "[t]o hold that the mere presence of a deterrent purpose renders such sanctions 'criminal' for double jeopardy purposes would severely undermine the Government's ability to engage in effective regulation of institutions."  Hudson, 522 U.S. at 105.  The same is true for purposes of determining whether a sanction is remedial or penal for purposes of survival.  Indeed, as will be discussed in the course of analyzing the sixth factor, the FBAR penalty serves the additional alternative purpose of reimbursing the Government for the cost of investigating and recovering the funds.

The fifth <u>Kennedy</u> factor considers whether the behavior addressed is already a crime.  <u>See Hudson</u>, 522 U.S. at 99.  As to this factor, the Court recognizes that the willful failure to file an FBAR can result in criminal prosecution.  <u>See</u> 31 U.S.C. § 5322.  Of course, Congress frequently imposes "both a criminal and civil sanction in respect to the same act or omission."  <u>Helvering</u>, 303 U.S. at 399.  Not only is Congress's decision to include a separate criminal penalty "insufficient to render the money penalt[y] . . . criminally punitive," <u>see</u> <u>Hudson</u>, 522 U.S. at 105, but it underscores Congress's intention that Section 5321 be regarded as remedial, <u>see</u> <u>Helvering</u>, 303 U.S. at 404-05.  Indeed, Congress's decision to label Section 5321 "Civil Penalties" "takes on added significance given its juxtaposition with the criminal penalties set forth in the immediately" following section, 31 U.S.C. § 5322. <u>Ward</u>, 448 U.S. at 249; <u>Helvering</u>, 303 U.S. at 404 ("The fact that the Revenue Act of 1928 contains two separate and distinct provisions imposing sanctions, and that these appear in different parts of the statute, helps to make clear the character of that here invoked.").

Sixth, as noted, in addition to its retribution and deterrence goals, the FBAR penalty serves the additional alternative purpose of acting "as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud."  <u>Helvering</u>, 303 U.S. at 401; <u>see also</u> <u>Reiserer</u>, 479 F.3d at 1164 (recognizing that tax penalties "serve the remedial goal of reimbursing the government for the costs in investigating tax fraud and for possible lost tax revenue."). In an analogous context, the Tax Court has observed that tax shelters "are notoriously difficult to detect and hard to prosecute.  Some promoters and taxpayers, aware of low tax return audit rates, consciously engage in attempts to game the tax system and get away with questionable transactions."  <u>Thompson v. Comm'r of Internal Revenue</u>, 148 T.C. No.

3, No. 6613-13, 2017 WL 448978, at *3 (U.S. T.C. Feb. 2, 2017).  The purpose of the FBAR is "to identify persons who may be using foreign financial accounts to circumvent United States law," and "to identify or trace funds used for illicit purposes or to identify unreported income maintained or generated abroad."  See IRS Reference Guide at 2; Cal. Bankers Ass'n v. Schultz, 416 U.S. 21, 26 (1974) (citation omitted) (recognizing that in passing the BSA, "Congress was concerned about a serious and widespread use of foreign financial institutions, located in jurisdictions with strict laws of secrecy as to bank activity, for the purpose of violating or evading domestic criminal tax, and regulatory enactments.").  Where as here an individual is alleged to have improperly reported his taxable income and concealed foreign accounts, the Government incurs "the heavy expense of investigation," Helvering, 303 U.S. at 401, and must "expend other public funds in order to uncover the fraud," Reimer's Estate, 12 T.C. at 921.  Under such circumstances the Supreme Court has recognized the remedial character of the sanction to safeguard the public revenue and reimburse the Government.  See Helvering, 303 U.S. at 401.  As such, collection of the penalty, in addition to the primary tax itself, "secure[s] full compensation for interference with the rights of the United States."  Helvering, 303 U.S. at 401; see also Reimer's Estate, 12 T.C. at 920-21 ("[A] taxpayer's filing of a fraudulent income tax return which understates his true tax liability . . . makes it necessary for the Government to expend other public funds in order to uncover the fraud and collect the proper amount of the tax due.").

Last, the Court finds that the FBAR penalty is not excessive in relation to this alternative purpose.  In Helvering, the Supreme Court found that a tax statute imposing a 50% penalty was remedial in nature in light of the important purposes served.  See Helvering, 303 U.S. at 401.  Many other courts have relied on Helvering to reach the same

conclusion.  See Bickham Lincoln-Mercury Inc. v. United States, 168 F.3d 790, 794-95 (5th Cir. 1999) (finding that a 50% assessment was reasonable "to offset the cost of investigating persons who conceal income from the IRS."); Thomas v. Comm'r of Internal Revenue, 62 F.3d 97, 103 (4th Cir. 1995) ("[T]he civil sanction to be exacted from Thomas is remedial in character, because 'it merely reimburses the government for its actual costs arising from the defendant's criminal conduct.'") (citation omitted); Rau's Estate v. Comm'r of Internal Revenue., 301 F.2d 51, 56-57 (9th Cir. 1962) (upholding a 50% tax assessment); Kirk, 179 F.2d at 622 (noting that the purpose of a 50% tax assessment is to "recompense [the Government] for the loss and expense occasioned by frauds perpetrated upon its revenue."); Reimer's Estate, 12 T.C. at 921 (noting that a 50% tax assessment was "designed solely to indemnify the Government for the monetary loss and damage sustained by reason of its being deprived of its revenue and the expense incurred incident to its collection.").  In light of the expenses the Government must incur to locate the concealed funds, it would "hardly be accurate to say that the only loss the [G]overnment can sustain from the [funds] . . .is their single value." Helvering, 303 U.S. at 401.

Notably, at least one court has determined that although "[a] 50% willful FBAR penalty—the maximum penalty permitted by statute—is severe," "it is an appropriate penalty in at least some circumstances" "given the ills it combats." Crawford v. U.S. Dep't of the Treasury, No. 3:15-cv-250, 2015 WL 5697552, *16 (S.D. Ohio Sept. 29, 2015). "Setting the maximum willful [FBAR] penalty as a substantial proportion of the account ensures that the willful penalty is not merely a cost of doing business for tax evaders, terrorists, and organized criminals." Id. Having carefully considered Congress's expressed preference that the FBAR penalty be considered a "civil sanction" and the seven Kennedy

factors, the Court finds no indication much less "the clearest proof" necessary to establish that the FBAR penalty is, in fact, penal in nature.  See Ward, 440 U.S. at 248-49.

In the Motion, Defendant relies on Dep't of Revenue of Mont. v. Kurth Ranch, 511 U.S. 767 (1994), Dye v. Frank, 355 F.3d 1102 (7th Cir. 2004), United States v. Hall, 730 F. Supp. 646 (M.D. Penn. 1990), United States v. Bajakajian, 524 U.S. 321 (1998), and Thompson to suggest that the 50% FBAR penalty assessed against him is "disproportionately punitive."  See Motion at 20-22.  However, the Court does not find these authorities persuasive.

In Kurth Ranch, the Court determined that a penalty under Montana's Dangerous Drug Tax Act was penal in nature, and therefore could not be imposed against an individual who had already been criminally punished for the conduct giving rise to the tax.  See Kurth Ranch, 511 U.S. at 783-84.  However, the Court based its determination that the drug tax was punitive on two key features of the tax, neither of which is present in Section 5321. First, the Court noted that the drug tax was "conditioned on the commission of a crime" and could be "exacted only after the taxpayer ha[d] been arrested for the precise conduct that g[a]ve[ ] rise to the tax obligation in the first place."  See Kurth Ranch, 511 U.S. at 781. Unlike the drug tax, "the entire class of taxpayers subject to" Section 5321 is not limited to those who have been arrested for failing to satisfy their reporting requirements.  Id. at 782; see also 31 U.S.C. § 5322 (setting forth criminal FBAR penalties).  Additionally, the Court found that the drug tax was "exceptional" because it was "levied on goods that the taxpayer neither own[ed] nor possesse[d] when the tax [wa]s imposed."  Kurth Ranch, 511 U.S. at 783.  Montana "presumably destroyed the contraband goods . . . before the tax on them was assessed."  Id.  Ultimately, the Court concluded that the drug tax "depart[ed] so far

from normal revenue laws as to become a form of punishment." Id.  Unlike the drug tax at issue in Kurth Ranch, Section 5321 is fairly unremarkable.  It is neither limited in application to criminals, nor assessed on goods that the taxpayer no longer owns or possesses.  Thus, the Court does not find Kurth Ranch persuasive.

In Dye, the Seventh Circuit relied on Kurth Ranch to determine that a drug tax was punitive for purpose of double jeopardy analysis.  See Dye, 355 F.3d at 1105 ("We find support for our conclusion in the closely analogous case of" Kurth Ranch.)  Thus, Dye is equally inapt.

Additionally, the Court finds Hall unpersuasive.  In Hall, the court relied on United States v. Halper, 490 U.S. 435 (1989), abrogated by Hudson, 522 U.S. at 101-02, to determine that the imposition of a civil fine pursuant to Section 5321 was punitive.  Hall, 730 F. Supp. at 649, 655.  The Hall court relied on Halper's finding that "'a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can be explained only as also serving either retributive or deterrent purposes, is punishment,'" and Halper's focus on whether the penalty compensates the Government for its losses to the exclusion of all other considerations.  Id. at 654 (quoting Halper, 490 U.S. at 448), 655 (citing Halper, 490 U.S. at 449-50).  However, in Hudson, the Supreme Court noted that since Halper, it has "recognized that all civil penalties have some deterrent effect," and that "[i]f a sanction must be 'solely' remedial (i.e., entirely nondeterrent) to avoid implicating the Double Jeopardy Clause, then no civil penalties are beyond the scope of the Clause."  Hudson, 522 U.S. at 101-02.[14]  Additionally, the Court specifically "disavow[ed]" Halper's analysis

---

[14]      Notably, the Court accepted cert. in Hudson for the stated purpose of addressing the variety of novel claims spawned by Halper.  Id. at 492-93.

concluding that Halper deviated from precedent by focusing on "whether the sanction, regardless of whether it was civil or criminal, was so grossly disproportionate to the harm caused as to constitute 'punishment,'" and "'assess[ed] the character of the actual sanctions imposed.'" Hudson, 522 U.S. at 101 (citing Halper, 490 U.S. at 447). Thus, to the extent that Hall is based on abrogated law, the Court does not find it persuasive.

Similarly, Bajakajian fails to persuade the Court that the FBAR penalty is excessive. In Bajakajian, the Court held that a statute requiring an individual to forfeit 100% of any currency that the individual exported from the country without reporting violated the Excessive Fines Clause of the Eighth Amendment. See Bajakjian, 524 U.S. at 324. The Court "ha[d] little trouble concluding that the forfeiture . . . constitute[d] punishment" because, like the drug-tax at issue in Kurth Ranch, the forfeiture was conditioned on the "conviction of an underlying felony, and it c[ould not] be imposed upon an innocent owner of unreported currency." Id. at 328. Further, the Court noted that the full forfeiture was grossly disproportional to the offense. Id. at 337-39. In committing this crime, "[t]here was no fraud on the United States, and respondent caused no loss to the public fisc. Had his crime gone undetected, the Government would have been deprived only of the information that $357,144 had left the country." Id. at 339. The matter before the Court is distinguishable from Bajakajian. As noted, the FBAR penalty is not conditioned on conviction of an underlying offense. Further, whereas the penalty in Bajakajian was designed to punish, the FBAR penalty "serve[s] the remedial purpose of compensating the Government for a loss." Id. at 329. Thus, Bajakajian is inapplicable to the instant case.

In the Motion, Defendant cites Thompson to show that "the test in Bajakajian is the proper litmus test for a court to determine whether a tax penalty is punitive or remedial in

nature."  See Motion at 21-22 (citing Thompson, 2017 WL 448978, at *5).  Although in Thompson, which arose in the context of an Eighth Amendment Excessive Fines challenge, the court applied the analysis set forth in Bajakajian, it nevertheless determined that the tax penalty at issue was remedial.  See Thompson, 2017 WL 448978, at **3-4.  Thus, Thompson appears to support the Government's position.

Additionally, the Court notes that Defendants' focus on the amount of the actual assessment imposed is misplaced.  See Motion at 21.  In the Motion, Defendants state:

> Assuming the highest marginal rate of tax on such income (39.6%), Steven Schoenfeld would have owed the Government only $1,376.95 in taxes on the foreign bank account at issue in this case.  In comparison, the penalty imposed on Steven Schoenfeld was $614,300.  This penalty is over 44,613.09% of the tax that Steven Schoenfeld is alleged to have not reported.

Id.  However, any determination based on the specific assessment at issue in this case would be "ill considered."  See Hudson, 522 U.S. at 101.[15]  In Hudson, the Court noted that Harper deviated from established precedent by improperly "'assess[ing] the character of the actual sanctions imposed,' rather than, as Kennedy demanded, evaluating the 'statute on its face' to determine whether it provided for what amounted to a criminal sanction."  Id. (citing Kennedy, 372 U.S. at 169) (internal citation omitted).  Thus, the Court will not evaluate the specific fine assessed against Steven Schoenfeld.

Ultimately, the Court is of the view that the Government's claim survives Steven Schoenfeld's death.  In doing so, this Court joins many others which have found that a tax penalty survives.  See Kahr v. Comm'r of Internal Revenue, 414 F.2d 621, 626 (2d Cir.

---

[15] As such, the Court declines to consider the financial records submitted by Defendants in support of the Motion and resolves the issue of survival based solely on the allegations of the Amended Complaint and legal arguments of the parties.

1969);[16] Rau's Estate, 301 F.2d at 55-57; Lee v. Comm'r of Internal Revenue, 227 F.2d 181, 183 (5th Cir. 1955); Scadron's Estate, 212 F.2d at 188 (noting that tax penalties of an additional 50% "are not to be considered penal in any sense."); Kirk, 179 F.2d at 622; Reimer's Estate, 12 T.C. at 921.  The Court also joins United States v. Garrity, 304 F. Supp. 3d 267 (D. Conn. 2018) and United States v. Park, No. 16 C 10787, 2017 WL 4417826 (N.D. Ill. Oct. 5, 2017), which allowed the IRS to pursue FBAR assessments against the non-reporter's heirs.  See Garrity, 304 F. Supp. 3d at 268; Park, 2017 WL 4417826, at *1.[17] The Court's holding also comports with legal scholarship suggesting that executors may be held liable for FBAR assessments.  See Stephen J. Dunn, FOREIGN ACCOUNTS COMPLIANCE §10:21 (2017); Arnold Y Kapiloff and Megan L. Brackney, Stuck with the Bill? An Ex'rs Personal Liab. for Unreported Foreign Accounts, 111 J. Tax'n 168 (2009).  In sum, a "need to reimburse the Government for its loss through fraud and for its expenditures in discovering and uncovering fraud survives the life of the discovered defrauders." Kahr, 414 F.2d at 626.  Thus, to the extent Defendants' Motion seeks dismissal based on the contention that the Government's claim abated upon Steven Schoenfeld's death, the Motion is due to be denied.

## IV.    Conclusion

In sum, the Court finds that the original Complaint was not a legal nullity which rendered this action void ab initio, and therefore, could be cured by amendment.  The

---

[16]    In Kahr, the Second Circuit recognized that a "50 per cent civil fraud addition may be assessed on the taxes owed by Kahr's estate," but found that such an addition could not be assessed on the facts before the court because the Government could not satisfy the requirement that "specific intent be proved before either the civil fraud addition [is] assessed or the criminal sanction [is] imposed." See Kahr, 414 F.2d at 626-27.

[17]    Notably, Garrity and Park do not discuss the survival issue.

Amended Complaint, filed by the Government as a matter of right, relates back to the date of the filing of the original Complaint and as such is not barred by the statute of limitations. Additionally, although the Government cannot state a claim against the Estate under Section 2404, it has stated a claim against Robert Schoenfeld as a distributee of the Estate. Finally, the Court finds that the Government's claim did not abate upon Steven Schoenfeld's death.  "Death may be an avenue of escape from many of the woes of life, but it is no escape from taxes."  Id.

Accordingly, it is **ORDERED**:

1. Defendants' Second Motion to Dismiss Amended Complaint or in the Alternative for Summary Judgment and Incorporated Memorandum of Law (Doc. 46) is **GRANTED, in part, and DENIED, in part**.

      a. The Motion is granted to the extent that the Estate seeks dismissal from this action.  The Clerk shall terminate the Estate as a Defendant.

      b. The Motion is denied in all other respects.

2. The stay entered by the Court in its November 13, 2017 Order (Doc. 48) is **LIFTED**.

3. The parties shall confer, and by **October 15, 2018**, file a joint notice of how they intend to proceed with regard to the remaining matters in this action.

**DONE AND ORDERED** at Jacksonville, Florida, this 25th day of September, 2018.

MARCIA MORALES HOWARD
United States District Judge

lc25
Copies to:
Counsel of Record