UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

    Case No. 3:16-cv-1248-J-34PDB

ROBERT SCHOENFELD, as distributee of
the Estate of Steven Schoenfeld,

    Defendant.
_____/

# O R D E R

**THIS CAUSE** is before the Court on Defendant Robert Schoenfeld's Motion for Partial Summary Judgment as to Penalties and Incorporated Memorandum of Law in Support Thereof (Doc. 64; Motion), filed on January 23, 2019. Plaintiff, United States of America (the Government), filed a memorandum in response on March 7, 2019. See Response in Opposition to Defendant's Motion for Partial Summary Judgment (Doc. 68; Response). With leave of Court, see Order (Doc. 70), Defendant filed a reply. See Defendant's Reply to Response to Motion for Summary Judgment (Doc. 72; Reply). Accordingly, Defendant's Motion is ripe for review.

**I.    Factual Background**

This action arises out of the Government's efforts to collect a civil penalty assessed against Steven Schoenfeld by the IRS pursuant to 31 U.S.C. § 5321 based on his alleged willful failure to file a Foreign Bank Account Report (FBAR).[1] See generally Amended

---

[1] The only disputed issue of fact in this case is whether Steven Schoenfeld's failure to file an FBAR was willful, and the parties agree that is an issue for the jury. See Defendant's Answer to Amended Complaint and Affirmative Defenses (Doc. 59) at 4-6; Joint Status Report (Doc. 62) at 3-5; Response at 3 n.3; Motion at 22 n.10.

Complaint (Doc. 6). The IRS notified Steven Schoenfeld that it had assessed a penalty against him in the amount of $614,300—50 percent of his foreign bank account's balance at the time of the violation—and demanded payment, but Steven Schoenfeld did not pay the amount demanded.[2] See id. ¶¶ 24-27. As such, on September 29, 2016, the Government initiated this action against Steven Schoenfeld to reduce its assessed penalty to judgment. See generally Complaint (Doc. 1). After learning that Steven Schoenfeld had passed away, the Government filed the operative Amended Complaint on December 14, 2016, naming as defendants the Estate of Steven Schoenfeld and Robert Schoenfeld, as distributee of the Estate. See generally Amended Complaint; Letter from Defense Counsel (Doc. 51-2). On September 25, 2018, the Court dismissed the Estate from this action, leaving Robert Schoenfeld as the only Defendant. See Order on Motion to Dismiss Amended Complaint or in the Alternative for Summary Judgment (Doc. 58; Order). On January 23, 2019, Defendant filed the instant Motion for partial summary judgment, requesting that the Court reduce the penalty assessed against Steven Schoenfeld to $100,000. See generally Motion.

## II. Statutory and Regulatory Authority

In 1970, Congress enacted the Currency and Foreign Transactions Reporting Act, commonly referred to as the Bank Secrecy Act (BSA), 31 U.S.C. §§ 5311, et seq. See Pub. L. No. 91-508, 84 Stat. 1114 (1970). The primary purpose of the BSA was to require the making of certain reports that "have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." Id. § 202. To effectuate this purpose, in the

---

[2] As of August 16, 2016, the amount sought by the Government had grown to $690,188.69, due to the accumulation of interest and penalties for late payment under 31 U.S.C. § 3717(e)(2). See Amended Complaint ¶ 28.

BSA Congress directed the Secretary of the Department of Treasury to promulgate regulations requiring the reporting of information from United States persons who have relationships or conduct transactions with foreign financial agencies. See id. § 241(a) (codified at 31 U.S.C. § 5314). The Secretary promulgated implementing regulations in 1972. See Financial Recordkeeping and Reporting of Currency and Foreign Transactions, 37 Fed. Reg. 6912 (Apr. 5, 1972) (originally codified at 31 C.F.R. pt. 103).[3] As relevant here, the Secretary's implementing regulations require "each United States person[4] having a financial interest in, or signature or other authority over, a bank, securities, or other financial account in a foreign country" to file an FBAR. See 31 C.F.R. § 1010.350(a). Such persons must file the FBAR by June 30 "of each calendar year with respect to foreign financial accounts exceeding $10,000 maintained during the previous calendar year." See 31 C.F.R. § 1010.306(c).

In 2002, the Secretary delegated the authority to administer and enforce the BSA to the Director of the Financial Crimes Enforcement Network (FinCEN), a bureau of the Department of Treasury. See Treasury Order 180-01; Financial Crimes Network, 67 Fed. Reg. 64697 (Oct. 21, 2002). In 2003, FinCEN delegated its "authority to assess and collect civil penalties for noncompliance with FBAR requirements" to the IRS. See Financial

---

[3] The Secretary originally published the BSA implementing regulations at 31 C.F.R. § 103, but moved the regulations to 31 C.F.R. § 1010 effective March 1, 2011. See Transfer & Reorganization of Bank Secrecy Act Regulations-Technical Amendment, 75 Fed. Reg. 65806 (Oct. 26, 2010).

[4] For purposes of 31 C.F.R. § 1010.350, the term "United States person" is defined as:
    (1) A citizen of the United States;
    (2) A resident of the United States. . . . ; and
    (3) An entity . . . formed under the laws of the United States, any State, the District of Columbia, the Territories and Insular Possessions of the United States, or the Indian Tribes.
31 C.F.R. § 1010.350(b). See also 31 U.S.C. § 5315(c).

Crimes Enforcement Network; Delegation of Enforcement Authority Regarding the Foreign Bank Account Report Requirements, 68 Fed. Reg. 26489 (May 16, 2003).  See also Motion, Appendix A: Memorandum of Agreement and Delegation of Authority for Enforcement of FBAR Requirements (Delegation of Authority) at 2.[5]

As originally enacted, the BSA did not contain a civil penalty provision for failing to comply with the FBAR requirements, see Pub. L. No. 91-508, 84 Stat. 1114 (1970), but Congress added one in 1986.  See Money Laundering Control Act of 1986, Pub. L. No. 99–570, Subtitle H, 100 Stat. 3207, § 1357 (October 27, 1986).  From 1986 to 2004, the maximum civil penalty for a willful violation of the FBAR requirements was limited to "the greater of (I) an amount (not to exceed $100,000) equal to the balance in the account at the time of the violation; or (II) $25,000."  See id.  After Congress added the civil penalty for FBAR violations, the Secretary promulgated amended implementing regulations.  See Amendments to Implementing Regulations Under the Bank Secrecy Act, 52 Fed. Reg. 11436, 11440, 11446 (Apr. 8, 1987).  Among other things, the regulations were updated to reflect civil penalties for violations after October 1986 "to keep the regulations as current as possible."  Id. at 11440, 11446.  Specifically, the regulation states in relevant part:

> (g)  For any willful violation committed after October 27, 1986, of any requirement of § 1010.350, § 1010.360 or § 1010.420, the Secretary may assess upon any person, a civil penalty:
>
> . . .
>
> (2)  In the case of a violation of § 1010.350 or § 1010.420 involving a failure to report the existence of an account

---

[5] Notably, FinCEN delegated "only its authority to enforce the FBAR provisions of the BSA"; its delegation of authority to the IRS did not affect "FinCEN's authority over any other provision of the BSA or its implementing regulations."  Delegation of Authority at 2-3.  Although FinCEN did not delegate to the IRS the authority to revise the FBAR regulations, FinCEN permitted the IRS to propose to FinCEN revisions to the FBAR regulations "to further enhance enforcement" of the BSA.  Id. at 3.

>           or any identifying information required to be provided with respect to such account, a civil penalty not to exceed the greater of the amount (not to exceed $100,000) equal to the balance in the account at the time of the violation, or $25,000.

31 C.F.R. § 1010.820(g)(2) (formerly 31 C.F.R. § 103.47).

In 2004, Congress increased the maximum civil penalty for willful FBAR violations to the greater of $100,000 or 50 percent of the account balance at the time of the violation.[6] See American Jobs Creation Act of 2004, Pub. L. No. 108-357, 118 Stat. 1418, § 821 (2004) (codified at 31 U.S.C. § 5321(a)(5)(C)). Specifically, § 5321(a) provides in relevant part:

> (5) Foreign financial agency transaction violation.—
>
> (A) Penalty authorized.—The Secretary of the Treasury <u>may</u> impose a civil money penalty on any person who violates, or causes any violation of, any provision of section 5314.
>
> (B) Amount of penalty.—
>
> (i) In general.—Except as provided in subparagraph (C), the amount of any civil penalty imposed under subparagraph (A) shall not exceed $10,000.
>
> . . .

---

[6] The Joint Committee on Taxation explained the reason for the increased penalty as follows:
> The Congress understood that the number of individuals using offshore bank accounts to engage in abusive tax scams has grown significantly in recent years. . . . The Congress was concerned about this activity and believed that improving compliance with this reporting requirement is vitally important to sound tax administration, to combating terrorism, and to preventing the use of abusive tax schemes and scams. The Congress believed that increasing the prior-law penalty for willful noncompliance with this requirement and imposing a new civil penalty that applies without regard to willfulness in such noncompliance will improve the reporting of foreign financial accounts.

Joint Committee on Taxation, General Explanation of Tax Legislation Enacted in the 108th Congress (JCS–5–05), May 2005 at 378.

5

(C) Willful violations.—In the case of any person willfully violating, or willfully causing any violation of, any provision of section 5314—

    (i) the maximum penalty under subparagraph (B)(i) <u>shall</u> be increased to the greater of—

        (I) $100,000, or

        (II) 50 percent of the amount determined under subparagraph (D)[.]

(D) Amount.—The amount determined under this subparagraph is—

. . .

    (ii) in the case of a violation involving a failure to report the existence of an account or any identifying information required to be provided with respect to an account, the balance in the account at the time of the violation.

31 U.S.C. § 5321(a)(5) (emphasis added). Significantly, the Secretary did not amend 31 C.F.R. § 1010.820(g)(2) to reflect the increased maximum civil penalty for willful FBAR violations. Thus, the statute states that the maximum civil penalty for a willful FBAR violation shall be the greater of $100,000 or 50 percent of the account's balance, while the regulation states that the penalty shall be no greater than $100,000.

**III. Discussion**[7]

At issue in this case is whether the IRS is bound by the $100,000 limit for willful FBAR violations set forth in 31 C.F.R. § 1010.820(g). In support of Defendant's argument that the IRS is bound by the regulation, Defendant contends that because § 5321(a)(5)(A) states that the Secretary "may impose," a civil penalty for a willful FBAR violation, the entire statute is "permissive in nature." See Motion at 6-7. By increasing the maximum civil penalty for a willful FBAR violation, Defendant argues, Congress merely established a higher "penalty ceiling," which the Secretary "'shall not exceed.'" Id. As such, Defendant maintains that § 5321 does not prohibit the Secretary from further reducing the maximum penalty amount for a willful FBAR violation, and, therefore, the regulation is not inconsistent with the statute. Id. at 5-9. Defendant further asserts that by assessing FBAR penalties in excess of the $100,000 limit set forth in the regulation, the IRS acted arbitrarily, capriciously, and not in accordance with the law. Id. at 19-21. In opposing Defendant's request to reduce the penalty assessed against Steven Schoenfeld to $100,000, the Government argues that "[w]ith its use of the term 'shall,' Congress unequivocally mandated the increase of the maximum penalty allowable for willful FBAR violations to the greater of $100,000 or 50 percent of the account's balance." See Response at 4. Thus, the Government contends that the regulation "is plainly inconsistent with § 5321(a)(5)(C),"

---

[7] Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). There are no factual disputes for purposes of this Motion. Thus, the Court concludes, and the Government does not dispute, that the issue raised in Defendant's Motion is appropriate to determine as a matter of law. Notably, in the parties' Joint Status Report (Doc. 62), which was filed before Defendant filed the instant Motion, the Government requested that the Court defer ruling on Defendant's Motion until after trial to "allow the case to proceed quickly to trial" and "to promote[ ] judicial economy." Joint Status Report at 3. However, the Government did not reiterate this request in its Response, and the Court finds it appropriate to dispose of the Motion before trial.

and the conflict must be resolved in favor of the statute. Id. at 6. Alternatively, the Government asserts that, "even if the Treasury Department were empowered to use a regulation to nullify a statute, it did not do so here." Id.

Before turning to the parties' arguments, the Court first notes that no court of appeals has addressed the question of whether the civil penalty for a willful FBAR violation is limited to $100,000. Indeed, as of this writing, it appears that only seven trial courts have answered this narrow question.[8] See United States v. Park, Case No. 16-cv-10787, 2019 WL 2248544 (N.D. Ill. May 24, 2019); United States v. Garrity, Case No. 3:15-cv-243(MPS), 2019 WL 1004584 (D. Conn. Feb. 28, 2019); United States v. Horowitz, 361 F. Supp. 3d 511 (D. Md. 2019); Kimble v. United States, 141 Fed. Cl. 373 (2018); Norman v. United States, 138 Fed. Cl. 189 (2018); United States v. Wahdan, 325 F. Supp. 3d 1136 (D. Colo. 2018); United States v. Colliot, Case No. 16-cv-01281-AU-SS, 2018 WL 2271381 (W.D. Tex. May 16, 2018).

The first two trial courts to address the issue agreed with Defendant's position that the IRS was bound by the $100,000 limitation set forth in the regulation. See Colliot, 2018 WL 2271381, at *2; Wadham, 325 F. Supp. 3d at 1139. In short, the district court in Wadham concluded that the maximum willful FBAR penalty in the regulation is not inconsistent with the maximum penalty in the statute, because "[t]he statute does not require imposition of the maximum penalty. Instead, it gives the Secretary discretion to impose penalties below the statutory cap. Hence, compliance with the lower cap set in 31 C.F.R. § 1010.820(g) also complies with § 5321." Id. The court reasoned that "a simple

---

[8] Garrity and Horowitz are on appeal at the Second and Fourth Circuits, respectively. Kimble and Norman are on appeal at the Federal Circuit. However, as of the date of this Order, the appellate briefing is not yet ripe for any of the cases on appeal. Notably, the parties in Wahdan and Colliot settled after the courts' decisions in favor of the taxpayers.

8

and straightforward interpretation gives coherent meaning to both the statute and the regulation—in the exercise of statutory discretion, the Secretary limited the penalties that the IRS could impose to $100,000 (plus the amount adjusted for inflation)." Id. Similarly, the court in Colliot rejected the government's argument that the limit in the regulation conflicts with the statute, concluding that "§ 1010.820 is consistent with § 5321's delegation of discretion to determine the amount of penalties to be assessed." Colliot, 2018 WL 2271381 at *2.

However, every court to have considered this issue since Wahdan and Colliot has concluded that the statute and the regulation conflict, the statute controls, and, as such, the IRS is not bound by the limit in the regulation. See Park, 2019 WL 2248544, at *7-10; Garrity, 2019 WL 1004584, at *1-5; Horowitz, 361 F. Supp. 3d at 513-16; Kimble, 141 Fed. Cl. at 386-89; Norman, 138 Fed. Cl. at 196. Upon consideration, the Court finds the analysis of these courts more persuasive than the analysis of the courts in Wahdan and Colliot. As aptly stated by the district court in Park, although "Congress did not establish specific reporting requirements in the BSA, leaving that to the Secretary, it did establish, in § 5321, specific parameters for civil penalties, providing what the maximum penalty for willful violations 'shall' be." Park, 2019 WL 2248544, at *8. See also Norman, 138 Fed. Cl. at 196 ("Congress'[s] use of the imperative, 'shall,' rather than the permissive, 'may,' . . . removed the Treasury Secretary's discretion to regulate any other maximum."). In agreeing with this interpretation of § 5321, the Court recognizes that "[t]he statute does not require imposition of the maximum penalty," and that it "gives the Secretary discretion to impose penalties below the statutory cap." See Wahdan, 325 F. Supp. 3d at 1139. However, merely because the statute vested the Secretary with discretion on some

matters, it does not follow that the statute necessarily vested the Secretary with the discretion to change the maximum penalty as established by Congress. See Park, 2019 WL 2248544, at *8 ("[I]t does not follow from the fact that the Secretary has discretion to establish the reporting requirements that give rise to an FBAR violation that the Secretary also has discretion to 'override Congress's clear directive' with respect to what the applicable penalties 'shall' be, once the Secretary 'chooses to impose them for a reporting violation.'" (quoting Garrity, 2019 WL 1004584, at *3)). Indeed, the plain language of the statute states what the maximum penalty "shall be." See 31 U.S.C. § 5321(a)(5)(C).

Notwithstanding this clear statutory language, Defendant maintains that "31 U.S.C. § 5321(a)(5) is permissive in nature, and the discretionary penalties set forth in the statute are capped by the regulations currently set forth in 31 C.F.R. § 1010.820." Motion at 5. To support this interpretation, Defendant relies on California Bankers Association v. Shultz, 416 U.S. 21, 26 (1974), and argues that because "the penalty provisions of the BSA are not 'self-executing,'" the IRS cannot impose penalties in the amount of 50 percent of the account balance in the absence of a corresponding implementing regulation permitting it to do so. See Motion at 6. In Shultz, the Supreme Court upheld the constitutionality of the BSA's domestic reporting requirements for financial institutions against various constitutional challenges. For example, the Supreme Court reversed the district court's determination that the BSA authorized the Secretary to impose reporting requirements that could amount to unreasonable searches and therefore violate the Fourth Amendment. Shultz, 416 U.S. at 64-66. In doing so, the Supreme Court stated that the district court was wrong to examine the "domestic reporting requirements imposed on plaintiffs by looking to the broad authorization of the [BSA] itself, without specific reference to the regulations

promulgated under its authority." Id. at 63. This was incorrect, the Court explained, because the BSA "is not self-executing, and were the Secretary to take no action whatever under his authority there would be no possibility of criminal or civil sanctions being imposed on anyone . . . ." Id. at 64. "The question [was] not what sort of reporting requirements might have been imposed by the Secretary under the broad authority given him in the Act, but rather what sort of reporting requirements he did in fact impose under that authority." Id.

Upon consideration, the Court determines that the Supreme Court's observation that the BSA is not self-executing was not intended to resolve the question presented here. The Court in Shultz "simply note[d] that the statute itself does not establish specific reporting requirements but affords the Secretary discretion to define those requirements for holders of foreign accounts." Garrity, 2019 WL 1004584, at *3 (citing Shultz, 416 U.S. at 26; 31 U.S.C. § 5314). In contrast to the reporting requirements, the statute does not direct the Secretary to establish the maximum penalty amounts. "Nothing in [Shultz] suggests that the Secretary must take some formal regulatory action before the penalty provisions of the BSA acquire the force of law."[9] Id.

To read the statute as Defendant suggests would render Congress's use of the word "shall" in § 5321(a)(5)(C) meaningless. See N.L.R.B. v. SW Gen., Inc., 137 S. Ct. 929, 941

---

[9] Defendant also appears to argue that the language "shall be increased" in § 5321(a)(5)(C) mandates an increase from the maximum penalty amount set forth in subparagraph (B) for non-willful violations, as opposed to the $100,000 maximum penalty for willful violations in the pre-2004 version of the statute. See Motion at 7. The Court agrees with the Government that "[t]his is a distinction without a difference." See Response at 8 n.5. Assuming that the language "shall be increased" in § 5321(a)(5)(C) mandates an increase from the maximum penalty amount set forth in subparagraph (B) for non-willful violations, the Court still concludes that § 5321(a)(5)(C) contains a maximum penalty amount established by Congress, which the Secretary does not have discretion to change.

(2017) ("The Board's interpretation makes the first requirement superfluous, a result we typically try to avoid."). Indeed, if Congress wanted the Secretary to establish the penalty amount for FBAR violations, it could have directed the Secretary to do that, like it did with the reporting requirements. See United States v. LaBonte, 520 U.S. 751, 757 (1997) ("[W]e assume that in drafting legislation, Congress said what it meant."). However, the plain language of § 5321 shows that Congress did not intend to delegate the determination of the maximum penalty to the Secretary. Accordingly, the Court is of the view that the $100,000 penalty limit set forth in 31 C.F.R. § 1010.820(g) is inconsistent with the statute and, therefore, without any legal effect. See generally State of Ga. by Dept. of Med. Assistance v. Heckler, 768 F.2d 1293, 1299 (11th Cir. 1985) ("[A]n agency regulation which conflicts with a statute passed by Congress is without any legal effect." (citations omitted)); Brush v. Office of Pers. Mgmt., 982 F.2d 1554, 1560 (Fed. Cir. 1992) ("This court must give effect to the statutory mandate as spelled out in Pub. L. No. 95–317. OPM is clearly instructed by Congress to inform annually each annuitant of all such annuitant's rights of election under sections 8339(j) and (k)(2). To the extent that 5 C.F.R. § 831.627 purports to instruct OPM otherwise, the regulation must be held to be invalid since it does not comport with the clear statutory mandate."); Legal Envtl. Assistance Found., Inc. v. U.S. E.P.A., 118 F.3d 1467, 1478 (11th Cir. 1997) (stating that EPA's interpretation of its regulation could not "be squared with the plain language of the statute and thus must fall").

Assuming arguendo that the statute did give the Secretary the discretion to reduce the maximum penalty for willful FBAR violations, the Court is not persuaded that is what the Secretary intended by failing to update 31 C.F.R. § 1010.820(g)(2) after Congress amended § 5321 in 2004. Indeed, the Court finds Defendant's argument that the

Secretary's failure to update the regulation is actually evidence of the Secretary's intent to limit the FBAR penalty to $100,000 to be unavailing. Rejecting a similar contention, the court in Garrity observed that "[t]he Secretary could not override Congress's clear directive to raise the maximum willful FBAR penalty by declining to act and relying on a regulation parroting an obsolete version of the statute." Garrity, 2019 WL 1004584 at *3. Notably, the penalty provision of the regulation was not even issued through notice-and-comment rulemaking, instead appearing for the first time in the final rule issued on April 8, 1987. Compare Notice of Proposed Rulemaking, 51 Fed. Reg. 30233 (Aug. 25, 1986); Money Laundering Control Act of 1986, Pub. L. No. 99–570 (October 27, 1986), with Amendments to Implementing Regulations Under the Bank Secrecy Act, 52 Fed. Reg. 11436, 11446 (Apr. 8, 1987). See also Garrity, 2019 WL 1004584, at *3 (noting that § 1010.820(g)(2) "was not promulgated after notice and comment, which means it was, at most, an interpretive rule . . . and it vested no rights in account holders" (internal quotation omitted)). As such, if the Secretary wanted to (and could) lower the maximum penalty set by the statute, it appears that he would, at a minimum, initiate notice-and-comment rulemaking. "This suggests that the reference to a civil FBAR penalty in the 1987 regulation was intended only to express the Secretary's intent to enforce the BSA with the full authority conferred on him by Congress. It is untenable to argue that the same regulation now significantly constrains the Secretary's ability to enforce the amended statute." Id.

As further purported evidence of the Secretary's intent to reduce the maximum penalty by not promulgating amended regulations, Defendant argues that Treasury Order 180-01 "expressly instructed FinCEN (and by redelegation, the IRS) to apply regulations capping willful FBAR penalties at $100,000 as of 2009 (and to this day)." See Motion at

10. The Court finds Defendant's reliance on Treasury Order 180-01 to be misplaced. The Secretary originally issued Treasury Order 180-01 on September 26, 2002, after Congress enacted the USA Patriot Act of 2001. See Treasury Order 180-01; Financial Crimes Enforcement Network, 67 Fed. Reg. 64697 (Oct. 21, 2002). The purpose of Treasury Order 180-01 was to re-establish FinCEN "as a bureau within the [Treasury] Department." Id. Within this context, the Secretary ordered that all BSA regulations "in effect or in use on the date of enactment of the USA Patriot Act of 2001 . . . shall continue in effect as regulations, rules, instructions, and forms of the Bureau until superseded or revised." Id. The Secretary re-issued Treasury Order 180-01 in July, 2014. See Treasury Order 180-01: Financial Crimes Enforcement Network (July 1, 2014), available at https://www.treasury.gov/about/role-of-treasury/orders-directives/pages/to180-01.aspx, (last visited on June 10, 2019). Notably, Treasury Order 180-01 does not specifically mention § 1010.820(g), or otherwise indicate that it should be applied notwithstanding the maximum penalty stated in the statute. Moreover, "[a]s explained above, the lower FBAR penalty in 31 C.F.R. § 1010.820(g) was superseded by statute in 2004. As a result, the general reference to reaffirming earlier regulations in Treasury Order 180-01 does not support an inference that the Secretary intended to reaffirm the lower penalties in the specific regulation at issue here." Garrity, 2019 WL 1004584, at *4.

Defendant also argues that FinCEN's later amendments to § 1010.820 evidence its intent that the IRS be bound by the limit in § 1010.820(g). For example, in 2016, FinCEN amended § 1010.820 to adjust the BSA's civil monetary penalty amounts to account for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. 2461 (FCPIAA). See Civil Monetary Penalty Adjustment and Table, 81 Fed. Reg. 42503

14

(June 30, 2016). Defendant argues that "[t]his 2016 amendment is illustrative. When Congress enacted a law that imposed a mandate on the Treasury, that is, to increase penalties in accordance with the Inflation Adjustment Act, FinCEN immediately updated its regulations accordingly. However, when Congress enacted a statute that allowed a discretionary increase on maximum penalties, FinCEN chose not to increase the amount of the penalty in the regulations." Motion at 17-18. The Court disagrees with this assessment. "At best, these actions imply that the Secretary knew the obsolete regulation remained on the books." Garrity, 2019 WL 1004584, at *4. Indeed, it appears the Secretary was required by the FCPIAA to update the monetary penalties in the Treasury regulations to account for inflation, because the statutes themselves would not do so. Congress's increase to the statutory penalties for willful FBAR violations, in contrast, was self-executing. Id.

Defendant also points to an FBAR reporting form, Form TD F 90-22.1, as evidence of the Secretary's intent to limit the maximum penalty for willful FBAR violations.[10] The form in effect on the date of Steven Schoenfeld's violation stated that "[c]ivil and criminal penalties, including in certain circumstances a fine of not more than $500,000 and imprisonment of not more than five years, are provided for failure to file a report, supply information, and for filing a false or fraudulent report." See TD F 90-22.1 (Revised 2000). This penalty notification is of little persuasive value, however, as it appears to be inaccurate even assuming the maximum civil penalty was limited to $100,000. The IRS may impose a civil monetary penalty for willfully failing to file an FBAR "notwithstanding the fact that a criminal penalty is imposed with respect to the same violation." 31 U.S.C. § 5321(d). As

---

[10] In 2013, FinCEN Form 114 replaced Form TD F 90-22.1

such, "[i]f the maximum civil monetary penalty were $100,000, as [Defendant] assert[s], then the maximum combined civil and criminal penalties would be $600,000, not $500,000, and the notification still would not provide accurate notice of the full range of available monetary penalties." Garrity, 2019 WL 1004584, at *4 (citing 31 U.S.C. § 5322(b) (authorizing criminal penalties up to $500,000)). As the court in Garrity concluded, "it appears that the form states only the available criminal penalties. In any event, Treasury revised the form in 2012 to state the correct civil penalties as well." Id. (citing Form TDF 90-22.1 (Rev. 2012) ("A person who willfully fails to report an account or account identifying information may be subject to a civil monetary penalty equal to the greater of $100,000 or 50 percent of the balance in the account at the time of the violation.")).

In short, none of Defendant's arguments persuade the Court that in failing to update the BSA implementing regulations after Congress's amendment to the statute in 2004, the Secretary intended to prohibit the IRS from being able to use its discretion and impose the maximum penalty allowed by the statute, "particularly given the IRS's clear statements to the contrary." Garrity, 2019 WL 1004584, at *4. Indeed, in its 2008 version of the Internal Revenue Manual (IRM), the IRS specifically recognized the conflict between the statute and the regulation, and stated that although "the regulations at 31 C.F.R. § [1010.820] have not been revised to reflect the change in the willfulness penalty ceiling . . . the statute is self-executing and the new penalty ceilings apply." See IRM § 4.26.16.4.5.1 (July 1, 2008), available at 2008 WL 5900930. Similarly, the current version of the IRM provides that "[f]or violations occurring after October 22, 2004, the statutory ceiling is the greater of $100,000 or 50% of the balance in the account at the time of the violation." See IRM § 4.26.16.4.5.1 (Nov. 6, 2015), available at 2007 WL 9418679. Although the IRM does not "have the force

16

of law," it does provide "persuasive authority" suggesting that the Secretary did not intend to limit the willful FBAR violation penalty to $100,000. See Griswold v. United States, 59 F.3d 1571, 1576 (11th Cir. 1995) ("While the IRS Manual does not have the force of law, . . . the manual provisions do constitute persuasive authority as to the IRS's interpretation of the statute and the regulations."); see also Romano-Murphy v. C.I.R., 816 F.3d 707, 719 (11th Cir. 2016) (same). Thus, for all of the reasons explained above, the Court declines to reduce the penalty assessed against Steven Schoenfeld for an alleged willful FBAR violation to $100,000.

Accordingly, it is

**ORDERED**:

1. Defendant Robert Schoenfeld's Motion for Partial Summary Judgment as to Penalties and Incorporated Memorandum of Law in Support Thereof (Doc. 64) is **DENIED**.

2. A telephonic status conference to discuss advancing this case on the Court's trial calendar is set for **Tuesday, July 2, 2019, at 3:00 p.m.** The parties shall appear telephonically by calling toll free at 888-684-8852. The access code to enter the telephone conference for all participants is: 5822282. You will then be prompted to enter the participant security code: 1612 followed by the # (pound) key.

**DONE AND ORDERED** in Jacksonville, Florida, on June 25, 2019.

*[signature]*
MARCIA MORALES HOWARD
United States District Judge

lc23

Copies to:

Counsel of Record